## CHICAGO, R. I. & P. RY. CO. *v.* DENVER & R. G. R. CO.

*(Circuit Court, D. Colorado. March 14, 1891.)*

CONTRACTS BETWEEN RAILROADS——USE OF TRACKS AND TERMINALS.

The contract between the Chicago, Rock Island & Colorado Railway Company and the Denver & Rio Grande Railroad Company for the joint use of the railway of the latter company between and including Denver and Pueblo construed, and *held* —*First,* that the Chicago company has not the right to use the Denver terminals for the cars it operates and the business it does over the Union Pacific Railway; *second,* that the Chicago company has the right to do its own switching and handle its own freights in the joint yards, but its switching engines and laborers must work under the orders, superintendence, and direction of a superintendent or other officer appointed by the Denver & Rio Grande Railroad Company, and invested with the sole and absolute superintendence and control of the work in the joint yards; *third,* that, under the clause of the contract excluding from its operation the "shops at Burnham," the shop-grounds appurtenant to the shops are excluded.

*(Syllabus by the Court.)*

In Equity. Bill for injunction.

*Thomas F. Withrow* and *Thomas S. Wright,* for plaintiff.

*E. O. Wolcott* and *J. F. Vaile,* for defendant.

CALDWELL, J. On the 15th day of February, 1888, the defendant, the Denver & Rio Grande Railroad Company, and the Chicago, Rock Island & Colorado Railway Company, both Colorado corporations, entered into a contract relating to the joint use and possession of the railway of the defendant between and including Denver and Pueblo. The contract is too lengthy to be set out in full, and, besides, much of it has no bearing on the questions now to be decided. Only those portions of it essential to a clear understanding of the present issues will be referred to. As much depends on the preamble and section 1 of article 1, they are here copied:

"*First.* The Denver Company owns and operates a railway with appurtenant property, a portion of the main line of which extends from Denver through Colorado Springs to South Pueblo, all in the state of Colorado; and the Chicago Company owns a railway which is being constructed from the western boundary of the state of Kansas, at which point it will connect with the Chicago, Kansas & Nebraska Railway, to the city of Colorado Springs, above mentioned.

"*Second.* The interest of both parties and of the public will be promoted by the establishment and operation of a through line of railway between all the points of the line of the railway of the Denver Company between and including Denver and South Pueblo, and all points on the line of railway which will be operated by the Chicago Company, and on the system of railways of which the Chicago Company will form a part.

"Therefore, in consideration of the premises, and of the several covenants, promises, and agreements hereinafter set out, the parties do covenant, promise, and agree, to and with each other, as follows:

"Article 1. The Denver Company covenants, promises, and agrees to and with the Chicago Company: Section 1. It hereby lets the Chicago Company into the full, equal, joint, and perpetual possession and use of all its tracks, buildings, stations, sidings, and switches on and along its line of railway between and including Denver and South Pueblo, excluding its shops at Burnham, meaning and intending hereby to include in the description aforesaid all

and every portion of its railway and appurtenant property between and at the points aforesaid, and all improvements and betterments thereof and additions thereto which may be jointly used by the parties, as hereinafter provided."

At the time this contract was entered into, the defendant owned and was operating about 1,500 miles of railroad in the state of Colorado. The Chicago, Rock Island & Colorado Company was incorporated under the laws of Colorado on the 31st day of January, 1888, with the following among other powers:

"To create, acquire by construction, lease, purchase, or otherwise, and to maintain and operate, a line or lines of railway, with appurtenant property, which shall extend from the point on the eastern boundary of Elbert county, and of the state of Colorado, where it shall connect with the railway of the Chicago, Kansas & Nebraska Railway Company, a corporation organized and existing under the laws of the state of Kansas; thence, in a south-westerly direction, by the most feasible route, to the city of Colorado Springs, in the county of El Paso, in the said state of Colorado, with a branch therefrom running in a north-westerly direction, by the most feasible route, to the city of Denver, in the county of Arapahoe, in said state of Colorado, and with a further branch therefrom extending south-westerly to the city of Pueblo, in the county of Pueblo, in said state of Colorado, and with a branch therefrom extending from said city of Colorado Springs northerly to said city of Denver, and with a branch therefrom extending southerly from said city of Colorado Springs to the said city of Pueblo,—to operate exclusively, or jointly with the owner thereof, its trains over any railway which now exists or may hereafter exist, connecting said cities of Denver and Pueblo."

Soon after its incorporation this company consolidated with the Chicago, Kansas & Nebraska Railway Company, a Kansas corporation bearing that name, and the line of railway constructed under the charter of the Chicago, Rock Island & Colorado Company was built by the consolidated company under its corporate name of the Chicago, Kansas & Nebraska Railway Company. By consolidation, sale, and lease, as set out in the plaintiff's bill, the plaintiff is entitled to all the rights of the Chicago, Rock Island & Colorado Railway Company, under the contract of that company with the defendant of February 15, 1888.

The controversy between the parties hinges on the proper construction of that contract. The parties are at issue upon three questions: *First.* Has the plaintiff the right under the contract to use the Denver terminals of the defendant for traffic which the plaintiff brings into and takes from Denver over the track of the Union Pacific Railway Company, and which has not passed, and is not routed to pass, over the joint track, via Colorado Springs? *Second.* Has the plaintiff the right to put its own switching engines, switching crews, and other employes in its exclusive service, into the Denver terminals, for the transaction of the plaintiff's business exclusively? *Third.* What is the extent of the grounds and property excluded from the joint use by the provision of the contract which excludes from its operation the defendant's "shops at Burnham?" The plaintiff contends that there is no exception or qualification to the "full, equal, joint, and perpetual possession and use" of the property described in article 1, § 1, except those specifically mentioned in the contract, which it claims are only four, viz.: The "shops at Burnham," (arti-

v.45F.no 5—20

cle 1, § 1;) the right to do local business on the line, (article 3, § 4;) the right to do express business, (article 3, § 4;) and the right to haul trains of other companies over the line, (article 3, § 11.)

1. The defendant insists that there are other exceptions and qualifications to the full, equal, and joint use of the leased property, and that one of these qualifications is that the plaintiff is entitled to the full, equal, and joint use of the terminals at Denver for business passing over the joint track via Colorado Springs only; in other words, that, under the contract, it is not competent for the plaintiff to introduce into the defendant's terminals in Denver its freight and passenger cars which arrive and depart from Denver over the road of the Union Pacific Railway Company. The railway of the plaintiff, as the representative of the contracting company, the Chicago, Rock Island & Colorado Railway Company, forms a connection with the defendant's road at Colorado Springs, and for some time after the contract was entered into all the business of the plaintiff's road was introduced on the joint track at that place. In the spring of 1889 the plaintiff entered into a trackage agreement with the Union Pacific Railway Company, by which it acquired the right to run its trains over the track of the last-named company from Limon, 90 miles east of Denver, and the point where that road crosses the plaintiff's, to Denver; and from that time the plaintiff has caused its through westward bound trains to be divided at that point, and has sent the Denver traffic over the line of the Union Pacific into the terminals of the defendant in Denver, and the Colorado Springs and Pueblo traffic over the plaintiff's line of road to Colorado Springs, and its traffic from Denver east is carried over the Union Pacific road to Limon, where the trains of the plaintiff from Colorado Springs and Denver are consolidated, and moved eastward as solid trains. The plaintiff's contention is that it has the right to introduce its trains, run upon any line of railway of its own or any other company, into the defendant's terminals at Denver and Pueblo, and to enter upon the joint track with its trains at any point between those places. The defendant's contention is that the contract contemplates and requires that the plaintiff shall introduce all its business onto the joint track at Colorado Springs, and not elsewhere, and that it has no right to use the terminals at Denver except for business to and from Denver over the joint track. The preamble to the contract discloses the situation of the parties at its date. It declares that "the Denver Company owns and operates a railway with appurtenant property, a portion of the main line of which extends from Denver, through Colorado Springs, to South Pueblo; * * *" and that "the Chicago Company owns a railway which is being constructed from the western boundary of the state of Kansas * * * to the city of Colorado Springs." It is true that the Chicago Company had the right under its charter to build its road to some other point than Colorado Springs. It could build its own line to Denver and Pueblo, and acquire its own terminals at those points, or it could, in the language of its charter, acquire the right "to operate exclusively, or jointly with the owner thereof, its trains over any railway which now exists, or may here-

after exist, connecting said cities of Denver and Pueblo." It is quite immaterial whether the defendant had or not knowledge that the charter of the Chicago Company authorized it to construct any or all of these different lines. Conceding that it had such knowledge, it also knew that it was competent for the Chicago Company to elect which of the lines it would build, and to become bound to the defendant by contract to build that particular line. It also knew that the charter of the Chicago Company expressly empowered it to enter into a contract of the character of the one in controversy. It finally elected to build its line to Colorado Springs, and to exercise its powers under this clause of the charter, and contract for the joint use of the defendant's railway "connecting said cities of Denver and Pueblo," instead of building a road of its own between those points, and acquiring its own terminals. It had not made this election when the contract was signed, and by a provision of the contract it was given until the 1st day of April, 1888, to do so. If, on or before that date, it elected to build its line "to Colorado Springs," and at and from that point "occupy the line of the Denver Company," the contract was to take effect; otherwise not. All this is distinctly stated in section 10 of article three, which reads as follows:

"Sec. 10. The Chicago Company shall, on or before the first day of April in the year one thousand eight hundred and eighty-eight, notify the Denver Company whether or not it elects to build its line aforesaid from said point on the western boundary line of the state of Kansas to said Colorado Springs. If it shall elect to build said line, it agrees to complete the same, and to occupy the line of the Denver Company, and to be bound by the terms of this contract, on or before the thirty-first day of December in the year one thousand eight hundred and eighty-nine. If it shall elect not to build said line, this contract shall, on the first day of April in the year one thousand eight hundred and eighty-eight, become void and of no effect."

By the express terms of this section, the election which the Chicago Company was required to make to put the contract in force was "to build its line" from the western boundary of the state of Kansas "to said Colorado Springs," and it is declared "if it shall elect not to build said line" the contract shall be void. The Chicago Company undoubtedly understood that to make the contract effective it must elect to build, and build its railway to Colorado Springs. This is apparent from the terms of the notice of its election, which it gave the defendant in pursuance of the requirement of section 10 of article 3, which reads as follows:

"CHICAGO, March 17, 1888.

"*To the Denver & Rio Grande Railroad Company:* You are hereby notified that the Chicago, Rock Island & Colorado Railway Company elects, as provided by the contract of February 15, 1888, to build its railway from the western boundary of the state of Kansas to Colorado Springs, and that it will have the same ready for operation on or before the thirty-first day of December in the year one thousand eight hundred and eighty-nine, (1889.)

"R. R. CABLE,

"President of the Chicago, Rock Island & Colorado Railway Company."

A notice that it had elected to build its railway to Denver or Pueblo, or to any other point than Colorado Springs, would not have satisfied

the requirements of the contract, which would thereby have "become void and of no effect." The essential thing to the life of the contract was the completion of the Chicago Company's railway to Colorado Springs, and the joint occupation of the defendant's railway was to be from that time, and by and through that physical connection. The motive of the defendant in requiring the business of the Chicago Company to be introduced onto the joint track at Colorado Springs is apparent when the method of compensating the defendant for the joint use of the leased property is considered. For such use the Chicago Company is to pay monthly:

"*First.* An amount equal to a one-twelfth part of two and one-half per centum of the value of the property described in article 1, section 1, hereof, and which value, it is agreed, is three million dollars: provided, that the Denver Company will fence its track from Denver to South Pueblo; will rebuild bridge No. 94 A, near Butte station, with iron and steel superstructure; will add a third rail to all side tracks and spur tracks on its line between Denver and South Pueblo, inclusive, which are not now provided with a third rail; will complete the relaying of its main track from Denver to South Pueblo, inclusive, with fifty-two (52) pound steel rail; will lay an additional track, with third rail, from Pueblo to the station on the line of said Denver Company about six (6) miles north of Pueblo; and will complete the structures along its line now in process of construction,—none of which improvements and betterments named in this proviso shall be added to the principal sum upon which the Chicago Company is to pay monthly an amount equal to a one-twelfth part of two and one-half per centum, but all other permanent betterments and improvements which shall be made to said property by the Denver Company in pursuance of the terms of this contract, after the Chicago Company notifies the Denver Company of its acceptance thereof, shall be added to said principal sum, and payment shall be made thereon by the Chicago Company, as herein provided.

"*Second.* An amount equal to a one-twelfth part of two and one-half per centum per annum upon all sums which the Denver Company shall from time to time pay for the construction or acquisition of additional tracks, facilities, and conveniences under section 1, article 3, hereof, except round-houses at Denver and Pueblo.

"*Third.* An amount equal to a one-twelfth part of five per centum upon the cost of constructing, and, in addition thereto, the cost of repairing, round-houses which the Denver Company may erect and maintain at Denver and South Pueblo, for the exclusive use of the Chicago Company, as provided in section 5, article 1, hereof.

"*Fourth.* An amount equal to the proportion of the cost or expenses actually incurred and paid during the month for keeping the railway and appurtenant property described in the first section of article 1 hereof in repair, and supplying it [the Chicago Company] with water, as the number of wheels per mile run by it [the Chicago Company] over said railway, or any part thereof, bears to the whole number of wheels per mile run over the same during the same period.

"*Fifth.* An amount equal to the actual cost of the coal delivered during the month to the engines of the Chicago Company under this contract.

"*Sixth.* An amount equal to a proportional share of the expenses actually incurred in paying proper salaries to the general superintendent and subordinate employes, including switchmen, telegraph operators, train dispatchers, and others, necessarily employed in the performance of the duties incident to the joint use and occupation of said railway, not including trainmen, which pro-

portion shall be ascertained in the manner provided in paragraph number four, above set out.

"*Seventh.* An amount equal to one-half of all taxes and assessments lawfully levied and actually paid during the month upon the property described in article 1, section 1, hereof; that is, that portion of the railway and appurtenant property used by the Chicago Company under this contract, excluding shops at Burnham, and equipments, facilities, and conveniences not intended for joint use by the parties hereto. If taxes shall be assessed upon earnings made upon said railroad, the Chicago Company shall pay its proportional share, which shall be as its earnings shall be to the sum of all earnings made in the same period upon the railway used under this contract by the Chicago Company."

"*Eleventh.* The cost of operating and maintaining all tracks, structures, and facilities used jointly by the Denver Company and the Chicago Company shall be apportioned between said companies on a wheelage basis. If any such property is operated or maintained by the Chicago Company, it shall receive from the Denver Company a portion of the expenses incurred in so operating and maintaining such property, which shall be as the wheelage of the Denver Company on the railway between Denver and Pueblo is to the entire wheelage on said railway between the points last aforesaid. Said Denver Company shall receive from the Chicago Company such a portion of the expenses incurred by the Denver Company in operating and maintaining the railway between Denver and Pueblo operated and maintained by the Denver Company, which shall be as the entire wheelage of the Chicago Company is to the wheelage on said railway between Denver and Pueblo."

Throwing the monthly into annual payments, the Colorado Company, by these provisions, agreed to pay $2\frac{1}{2}$ per cent. annually on \$3,000,000, the agreed value of the road, and the like per cent. on the cost of the construction or acquisition of additional tracks and other conveniences and improvements made or acquired, as provided in the contract. The payment of this interest was, undoubtedly, one of the principal considerations which moved the defendant to enter into the contract. But it was not the only one. Another important and valuable consideration was the proportion of the expenses incident to the repair, maintenance, and operation of the railway which the Colorado Company was required to pay on a wheelage basis. These expenses are necessarily large, embracing, as they do, in the language of this contract, the expense of "keeping the railway and appurtenant property * * * in repair, * * * salaries to the general superintendent and subordinate employes, including switchmen, telegraph operators, train dispatchers, and others necessarily employed in the performance of the duties incident to the joint use and occupation of" the railway. The fourth clause of section 2 of article 2 fixes the rule by which these expenses are to be apportioned and paid. They are to be shared by the Chicago Company in the proportion as the number of wheels per mile run by it over the joint track bears to the whole number of wheels per mile run over the same during the same period. The greater its wheelage the larger the proportion of the expenses it must pay. It is this feature of the contract that makes it an object of interest to the defendant to require the Chicago Company to connect with its railway at Colorado Springs. In this way the Chicago Company is compelled to pay wheelage on all its traffic from Colo-

rado Springs to Denver and from Colorado Springs to Pueblo. The rule of computation fixed by the contract is upon the wheelage passing "on the railway between Denver and Pueblo," which necessarily includes the terminals at those places. The terminals are incident to the main line. Wheelage for business done in the terminals separate and distinct from the main line is not contemplated by the contract, nor is it capable of separate computation. It is obvious, therefore, that if the plaintiff may withdraw its traffic from the defendant's railway, and use the tracks of another company to introduce its business into the defendant's terminals in Denver, the defendant will be deprived of a large source of revenue applicable to the payment of the expenses mentioned, and its terminals will be burdened with business from which it derives no revenue or benefit. In the brief of the learned counsel for the plaintiff, it is said:

"For the use alone, via Colorado Springs, the two and one half per cent. rental, plus wheelage, would be onerous upon the lessee. If, however, it may also go by the way of Denver,and enjoy the leased line on that 'portion thereof' by that approach, the rental would be less onerous, and the right to do this may fairly be supposed to have been an inducement for the lessee to make the contract."

If the Colorado Company assumed burdens, it also acquired some advantages. It obtained the benefits of the defendant's railway by paying a low rate of interest on one-half the sum it would cost to build an independent line; and, if it had built an independent line, it would have had to pay the entire cost of maintaining, repairing, and operating the same, whereas, under the contract, it is relieved of a large share of this burden. It enjoys the use of the defendant's line, and the expenses of maintaining, repairing, and operating it are apportioned between the two companies in proportion to the wheelage of each. The benefits are reciprocal, each company being relieved of a portion of the expenses of maintaining and operating the road. But, whether reciprocal or not, and however onerous "the two and one-half per cent. rental, plus wheelage," may be, it is enough to say that the Chicago Company agreed to put its business on the joint track at Colorado Springs, and pay wheelage accordingly, and that it must abide by its contract. Other provisions of the contract abundantly support the view the court has taken of this question. The locomotives of the Chicago Company would necessarily require coal and water, and section 3 of article 1 provides for the furnishing of these articles by the defendant in this language:

"It will, upon like requisition, furnish, in the same manner it provides its own locomotives on its tracks above described, all water and coal which the Chicago Company will need for the operation of its trains over the railway of the Denver Company. The compensation which shall be paid for the water supply shall be ascertained on the basis of the wheelage as hereinafter provided for expenses of maintenance and repairs."

It will be observed that provision is made for furnishing these articles to locomotives operated over "the railway of the Denver Company" only. In section 5 of article 1 the Denver Company agrees, under certain con-

ditions, to maintain engine houses "to properly and safely shelter all locomotive engines which the said company may have occasion to use on the railway of the Denver Company." By section 2 of article 2 the obligation of the Chicago Company to pay for the use of the property begins upon the completion of its road "to a connection with the railway of the Denver Company at or near Colorado Springs." In section 3, art. 2, the Colorado Company covenants that "it is legally incorporated, and has power to construct, maintain, and operate a railway which will extend from the western boundary of the state of Kansas to Colorado Springs, in the state of Colorado." Why this covenant, and no reference to its power to construct a railway to any other point? Why covenant that it had power to construct a road to Colorado Springs if the Denver Company had no interest in that fact, and was to derive no benefit from it? In section 4 of article 3, there is a clause which plainly shows that it was not the intention of the parties that the Chicago Company should connect with the Denver Company's lines except at the places specifically mentioned in the contract. That clause reads as follows:

"But it [the Chicago Company] shall have the right to transport persons and property between stations on its railway and connecting lines, and all points between and including Denver and South Pueblo: provided, however, that if the Chicago Company shall at any time acquire, by construction, purchase, or otherwise, a railway extending not less than fifty miles from Pueblo, it shall have the right to transport persons and property between any points on such line and Denver."

The privilege to the Chicago Company to make this connection at Pueblo excludes the idea that it may make a like connection at any other point, and especially at Denver. Pueblo is one terminal of the line described in the contract. Denver is the other terminal. A special provision of the contract authorizing a connection at Pueblo implies that, in the absence of such a provision, the right would not have existed, and that it does not exist as to Denver. The grant in section 1 of article 1 to the Chicago Company of "the full, equal, joint, and perpetual possession and use" of the leased property is not, therefore, absolute and unqualified, and the words "as hereinafter provided" at the end of that section qualify the whole section, and have reference to the provisions of the contract to which reference has been made, limiting, qualifying, and explaining the granting clause.

The Denver Company has always denied the right of the plaintiff to use the Denver terminals for its Union Pacific traffic. As soon as the plaintiff commenced running its cars over the Union Pacific Railway, the defendant's general manager addressed the following dispatch to the president of the plaintiff company:

"DENVER, COLORADO, May 10, 1889.

"*R. R. Cable, Chicago, Ills.:* I have just seen Mr. Allen, general superintendent, and have notified him that, although we are not required by our contract to handle or care for your trains and equipment brought to Denver over the Union Pacific line, we do so temporarily, with the understanding that the compensation for such service, as also for the use of our tracks by such trains, will be made at an early date.    S. T. SMITH."

To this dispatch the plaintiff's president replied as follows:

"CHICAGO, ILL., 5/11, 1889.

"*S. T. Smith, G. M., Denver:* Your telegram received. Of course any service performed for us not covered by contract will be paid for by our company. I come out in June. I will spend time enough with you to take up all matters between us that may require attention. Have no doubt that everything can be satisfactorily arranged.                    R. R. CABLE."

Later, Mr. Smith addressed to Mr. Cable a letter, in which he said:

"The cars you are running to and from Denver by way of the Union Pacific Railway in no event can come under the terms of the lease, and you have no right to pass them through or over any part of the leased property, and have heretofore done so under promise that you would arrange as to the compensation therefor."

This has been the attitude of the defendant on this question at all times. Its position is justified by the terms of the contract.

2. Has the plaintiff right under the contract to put into the Denver terminals its own switching engines and switching crews and other employes engaged in its exclusive service? This question arose as to the yard at Colorado Springs within two or three months after the joint use of the railway under the contract began, and was considered by the general counsel and general manager of the defendant. Their interpretation of the contract on behalf of the defendant on this point found expression in the following letter:

"DENVER, COLORADO, Feb. 16, 1889.

"*Mr. R. R. Cable, President C., R. I. & P. R. R., Chicago, Ill.*—DEAR SIR: Referring to the differences of opinion which have arisen respecting the respective rights of the C., K. & N. R. R. Co., under the agreement of February 15, 1888, the following queries have been submitted, and, after conferring with our general counsel, have been answered as follows:  *   *   * *Q.* 2. Under the contract, are the C., K. & N. switch engines allowed to do work in Colorado Springs yard, and should all switching, including transfer to Midland, be done by the D. & R. G. switch engines, and does the Colorado Springs yard stand upon any other basis than those at Pueblo and Denver? *A.* The C., K. & N. Co. has the right, if it desires to do so, to do work in the Colorado Springs yard with its switch engine, and to do all the necessary switching for that company with its own engines; but this can only be done under the direction and instructions of the superintendent or other designated officers of the D. & R. G. R. R. Co. The same rule applies in this as stated in query one, that all movements of engines, trains, and cars must be under the sole direction of the superintendent or designated officer of the D. & R. G. R. R. Co. There can can be no divided authority in regard to the movements of engines, trains, and cars. In this respect, the yards at Pueblo, Colorado Springs, and Denver are subject to the same principle.  *   *   *

"Yours, truly,

[Signed]                    "S. T. SMITH."

On the 22d of the same month Mr. Cable answered as follows:

"We have acted upon the theory that the movements of trains on your tracks must be under the direction of your operating officers, that operations in the yards must conform to reasonable yard rules, and that in all other respects we have exclusive control of our engines and cars. If your operating officers are not willing to conform their exercise of that authority to these

limits, our respective rights will have to be determined by arbitration, as provided by the lease."

Some question is now raised as to the policy or practicability of permitting each company to have its own switching engines and crews in the terminals or yards to do its own work. It would undoubtedly be impracticable to have two switching crews under different supervision, working in the same yard, at the same time. But the difficulty vanishes when all the movements of the switching engines and crews of both companies are under the sole and exclusive supervision and direction of a single head. The defendant in its letter to Mr. Cable concedes the plaintiff's right to do its own switching in the Colorado Springs yard, and that "in this respect the yards at Pueblo, Colorado Springs, and Denver are subject to the same principle." The defendant rightfully claims, and the plaintiff concedes, that the movements of the switching engines and crews "must be under the sole direction of the superintendent or designated officer of the D. & R. G. R. R. Co." The letter of Mr. Smith to Mr. Cable contains a correct exposition of the contract on this point. The plaintiff has the right to do its own switching and handle its own freight in the yards at Denver, under the supervision, direction, and control of the defendant's superintendent, or other proper officer.

3. What property is excluded from the operation of the contract by the words "excluding its shops at Burnham?" These exact words occur twice in the contract,—first in section 1 of article 1, where they are used to exclude whatever they stand for from the granting clause; and, second, in section 1 of article 2, where they are used to exclude whatever they embrace as any part of the joint property on which the plaintiff is required to pay its proportion of taxes. In construing these words in this contract it is necessary to take into consideration the situation and necessities of the parties in respect to the "shops at Burnham," and the situation, condition, and uses of that property   The Denver Company owned and was operating 1,500 miles of railway. Its principal shops for making, constructing, and repairing its locomotives, cars, machinery, and appliances, and for storing railroad cars, supplies, and materials, old and new, for its whole line of road, were situated in Denver, and known as "the shops at Burnham." For such an extended line of road extensive shop grounds and buildings and shop tracks and other fixtures and appliances were required. The grounds originally acquired by the Denver Company for shop purposes comprised about 40 acres. This amount of land was found to be insufficient to meet the wants and necessities of the company for this purpose, and from time to time additions were made to the grounds by purchase, and at the date of the contract the ground which had been purchased for use as shop grounds, and set apart for that exclusive purpose, comprised about 60 acres. The map of the defendant's Denver property was before the parties during the negotiations that led up to the contract, on which the shop grounds were stated to embrace 40 acres, and that was the extent of them when that map was made; but by subsequent purchases they have been extended, until at the date of the contract they embraced 60 acres. There is some

conflict in the testimony as to what took place between the parties in reference to this matter. Some witnesses have probably forgotten what others recollect. But I think it highly probable that the boundaries of the shop grounds at Burnham, as they stood at the date of the contract, were pointed out or outlined on one or more of the maps which the officers of both companies had before them at and before the time the contract was entered into. It is quite certain that both parties understood that the expression "the shops at Burnham" was not to be restricted to the shop buildings only.

But the decision of this question is not rested on the parol testimony about the understanding of the parties to the extent of the grounds appurtenant to the shops. Nor is the term "railroad shops," in the connection in which it is used in this contract, and in the light of the surrounding conditions and circumstances, which must be taken into consideration in construing the contract, a term of art that requires the testimony of experts to explain its meaning to the court. But. if it is, the weight of the expert testimony is to the effect that railroad men would understand the term "railroad shops" included all the tracks and grounds set apart and used for shop purposes. In railroad parlance, "railroad shops," when used in the sense of that term in this contract, include the shop grounds without which mere shop buildings would be of little or no utility or value for railroad purposes. It is obvious that the term "railroad shops" includes much more than would be included in the term "shoe shop" or "tailor shop." Commonly, the word "shop" means a building inside of which a mechanic carries on his work; but by far the greater portion of all principal railroad shops, such as the parties to this contract had in contemplation, are without a covering. The plaintiff seeks to construe this exception as though it read "the buildings on the shop grounds." But that would be to change its whole meaning. When critically read, the contract leaves no room for doubt on this question. The language of the contract descriptive of the property affected by it is extremely general and comprehensive. Three millions of dollars' worth of property is described in half a dozen lines, in the midst of which is the sentence, "excluding the shops at Burnham." The property excepted from the grant is described in the same general and comprehensive terms that are used in describing the property that is granted. The property covered by the contract, including that excluded from its operation, is described in these general terms, viz.:

"Its tracks, buildings, stations, sidings, and switches on and along its line of railway between and including Denver and South Pueblo, excluding its shops at Burnham, meaning and intending thereby to include in the description aforesaid all and every portion of its railway and appurtenant property between and at the points aforesaid."

It will be observed that neither the words "real property" nor "real estate" nor "lands" nor "grounds" are anywhere used in describing any portion of the property covered by the granting clause of the contract, but these general words only, viz.: "Its tracks, buildings, stations, sidings, and switches on and along its line of railway, * * * and ap-

purtenant property." Under the terms of this grant, the only ground upon which the plaintiff can claim a joint interest in the shop grounds, or any other parcel of land, is that it is "appurtenant" to the thing or things specifically granted. But the rule of the contract, and which is a rule of law independently of the contract, by which appurtenant property passes, applies as well to the property excepted from the grant as to that granted; and the question comes to this: Are the shop grounds "appurtenant" to the shops, or to something else? It is clear that shop grounds at Burnham, used for shop purposes, and not intended for any other use, are "appurtenant" to "the shops at Burnham," and not to the "tracks, buildings, sidings, and switches" granted to the Colorado Company. No piece of property could be more "appurtenant" to another than the shop grounds are to the shops, and to detach the shop grounds from the shops, and declare them an "appurtenance" to the track, or some building, siding, or switch, in connection with which they were never designed to be used, and to the proper use of which they are not essential, would be extremely unreasonable, and contrary to the plain meaning of the contract. It seems that a subordinate agent of the defendant in listing the property for taxation distinguished between shops and yards, and that the plaintiff has been charged with and paid one-half of the taxes on some portion of the shop grounds. The listing was done in conformity, or supposed conformity, to the revenue laws of Colorado, and had no reference to the rights of the parties under the contract, of which the agent, who attended to the taxes, had no knowledge. No estoppel arises from anything that took place about the taxes. The defendant, from the beginning, has claimed that the shop grounds were excluded from the contract.

A great deal of testimony has been taken in the case, very little of which is competent, and it has not been referred to for that reason. If competent, it would tend to support the conclusion of the court.